**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Alondra Viridiana Castillo-Badillo,<br><br>　　　　　　Defendant. | No. CR-25-00720-001-PHX-KML<br><br>**ORDER** |

Defendant Alondra Viridiana Castillo-Badillo was convicted of improper entry by an alien, a misdemeanor, after a magistrate judge bench trial. She now appeals that conviction, arguing the magistrate judge incorrectly denied both her motion to suppress arising from a traffic stop and her motion to dismiss based on the government's failure to disclose *Brady* material until the morning of trial. Because the traffic stop was not prolonged, any *Miranda* violation was harmless, and Castillo-Badillo was able to use the impeachment material on cross-examination, her conviction is affirmed.

**I.     Factual and Procedural History**

At around 11 p.m. on March 25, 2025, Castillo-Badillo was the passenger in a vehicle Pinal County Sheriff's Office Detective Mark Terry pulled over for speeding. (SER-146–47.)[1] Detective Terry encountered the car while patrolling a stretch of I-10 near Eloy, Arizona, which was busy at that time of night with cars and semi-trailer trucks passing by. (SER-147.)

---

[1] The government's supplemental excerpts of record are filed at Doc. 22-1. Record cites are to its internal pagination instead of the ECF header.

1  Detective Terry stopped the vehicle for traveling 90 miles per hour in an area where
2  the speed limit was 75. (SER-147–48.) He approached the driver first and found she did
3  not speak English. (SER-153.) Because Detective Terry speaks very little Spanish, he
4  communicated with the driver using the Google Translate app. (SER-154–55.) He asked
5  the driver for her license, registration, and proof of insurance. (SER-156.) The driver told
6  Detective Terry she could only provide him with her passport because she did not have a
7  valid driver's license. (SER-158.)

8  The driver's lack of a license left Detective Terry in a quandary, because he had
9  pulled the car over on the side of the busy highway and needed someone with a valid license
10 to legally drive the car away from the scene no matter the outcome of the speeding
11 investigation. (SER-158, 167.) By that time, Detective Terry had called another detective
12 who was fluent in Spanish to make sure he was correctly understanding what the driver
13 was saying. (SER-160, 163.) That detective also spoke to the passenger, Castillo-Badillo,
14 who said she did not have a valid license either. (SER-165–66.) The driver had a friend in
15 Tucson who could come drive the vehicle away, but Tucson was 45-60 minutes away so
16 the friend could not get there quickly. (SER-170, 206.) By about fourteen minutes into the
17 traffic stop, Detective Terry had completed his investigation of the speeding violation but
18 still needed to make sure the vehicle could be driven safely from the scene. (SER-160.)

19 Detective Terry routinely takes a number of steps during a traffic stop. They include
20 identifying the driver and the passenger to see whether they have valid licenses or active
21 warrants, and determining whether the vehicle's registration is up-to-date. (SER-188–92.)
22 Here, it was particularly important to identify the passenger because if she had a valid
23 license, Detective Terry would have turned the car over to her to drive away. (SER-190.)
24 As her identification, Castillo-Badillo had shown Detective Terry a picture of a Mexican
25 voter registration card that was so blurry as to be almost entirely illegible (Doc. 14 at 83),
26 so he contacted Border Patrol to try to identify her through their (better) databases (Doc.
27 14 at 86–90; SER-170–71, 173, 190). Border Patrol was able to identify Castillo-Badillo
28 and confirm she was an undocumented alien approximately 23 minutes into the stop. (Doc.

14 at 86; SER-174.) Border Patrol told Detective Terry they would respond to the scene and were there within fifteen minutes. (SER-175.) Both women were standing by Detective Terry's car when Border Patrol Agent Francisco Gonzalez arrived, and Detective Terry ultimately allowed the unlicensed driver to drive the car away. (SER-205–06.)

Agent Gonzalez was responding to local law enforcement calls for assistance that night. (SER-195.) After Gonzalez arrived on scene and identified himself as a Border Patrol agent, Castillo-Badillo basically told him she was in the United States illegally. (SER-197.) Agent Gonzalez also ran facial recognition software and Castillo-Badillo's biometrics came back showing Border Patrol had apprehended her twice in the past. (SER-197–98, 203.) Agent Gonzalez does not decide whom to prosecute and so does not read *Miranda* warnings; because any arrest he makes is for a civil administrative immigration charge, he simply takes the person back to the station for processing. (SER-199–200.) Back at the station, Castillo-Badillo waived her *Miranda* rights and again admitted she was present in the United States illegally. (SER-70, 222, 225.) She said she had entered the United States illegally by walking through the desert near Douglas, Arizona, in 2023. (SER-73–74, 76.)

Castillo-Badillo moved to suppress, arguing the traffic stop was unreasonably prolonged and her statement to Agent Gonzalez was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). (D. Ct. No. 25-mj-09186-ESW, Doc. 12.) The magistrate judge held a hearing and later denied the motion in a minute order without findings of fact or conclusions of law. (D. Ct. No. 25-mj-09186-ESW, Docs. 19, 23.) The next day, the magistrate judge held a bench trial at which Detective Terry and Agent Gonzalez testified again. (SER-8–136.)

Late in the afternoon before trial, the government received impeachment information about Agent Gonzalez. (SER-11.) That information indicated that in 2004, a civilian made a complaint that Agent Gonzalez had been rude to him and discriminated against him based on Mexican descent. (Doc. 14 at 95.) The civilian's allegations "were found to be unsubstantiated and no disciplinary action was taken." (Doc. 14 at 95.) The government tried to disclose the information to Castillo-Badillo within an hour of receiving

it that afternoon, but the defense refused to agree to a protective order so it did not. (SER-11–1.) After the government orally moved for a protective order the morning of trial and the magistrate judge denied it, the government disclosed the impeachment information to both the magistrate judge and the defense. (SER-11–17.) Castillo-Badillo moved to dismiss the case based on the untimely disclosure (SER-15), the magistrate judge denied that motion (SER-17–18), and the defense used the impeachment information to cross-examine Agent Gonzalez later when he testified (SER-53–55).

After the trial, Castillo-Badillo was convicted of improper entry by an alien and sentenced to time served. (SER-133–35.)

## II.    Analysis

Castillo-Badillo appeals her conviction based on the magistrate judge's denial of her motion to suppress and her motion to dismiss. (Doc. 17.) A district judge considering an appeal of a magistrate court conviction reviews the magistrate judge's legal conclusions *de novo* and her factual findings for clear error. *Quinn v. Robinson*, 783 F.2d 776, 791-92 (9th Cir. 1986); *see also* Fed. R. Crim. P. 58(g)(2)(D). The court can affirm for any reason supported by the record. *United States v. Mayweather*, 634 F.3d 498, 504 (9th Cir. 2010).

### A. Prolonged Traffic Stop

To be lawful, the Fourth Amendment requires that a seizure during a traffic stop be "limited in its scope." *United States v. Steinman*, 159 F.4th 550, 560-61 (9th Cir. 2025). The officer may take the time necessary to "address the traffic violation that warranted the stop," make "ordinary inquiries" incident to the stop, and "attend to related safety concerns." *Id*. at 561. But the stop may last "no longer than is necessary to effectuate these purposes and complete the traffic 'mission' safely." *Id*. (simplified).

Detective Terry's initial decision to make the stop was justified because he had probable cause to believe the driver had committed a speeding violation. *See United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007). The parties do not contend otherwise. But Castillo-Badillo argues Detective Terry unreasonably prolonged the seizure because he continued to hold her for identification after he had completed his investigation

of the speeding violation fourteen minutes into the stop. (Doc. 17 at 15–20.)

"The identity of a passenger . . . will ordinarily have no relation to a driver's safe operation of a vehicle." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019). Prolonging a stop to identify a passenger where her identification has no bearing on the mission of a traffic stop—to "ensur[e] that vehicles on the road are operated safely and responsibly"—may therefore violate the Fourth Amendment. *Id*. But where the investigator has determined a driver cannot lawfully drive the vehicle away from the scene, the identity of the passenger does become relevant to the public-safety mission. *See Diaz-Castaneda*, 494 F.3d at 1153; *United States v. Thompson*, 481 F. Supp. 3d 1128, 1133 (D. Mont. 2020). Because that mission includes ensuring the safe disposition of the stopped vehicle, *see South Dakota v. Opperman*, 428 U.S. 364, 369 (1976), identifying whether a passenger can lawfully drive the vehicle off the roadside in that situation contributes to officers' safety such that prolonging the stop may comply with the Fourth Amendment. *See United States v. Ramirez*, 98 F.4th 1141, 1144 (9th Cir. 2025) (discussing situations in which traffic stop may be prolonged for officer-safety reasons); *Steinman*, 159 F.4th at 565.

Setting aside whether Detective Terry's general practice of identifying passengers in traffic stops would comply with the Fourth Amendment, determining Castillo-Badillo's identity here did. The driver could not lawfully drive the vehicle off the shoulder of a busy highway, so identifying whether Castillo-Badillo could do so contributed both to Detective Terry's safety and that of the general public. *Diaz-Castaneda*, 494 F.3d at 1153. Because Detective Terry learned Castillo-Badillo was likely undocumented as he identified her and Border Patrol reported to detain her before a licensed driver was found to safely remove the vehicle from the scene, the stop was not unreasonably prolonged.

**B.  *Miranda* Warnings**

Castillo-Badillo also argues the magistrate judge should have suppressed the statement she made to Agent Gonzalez about her alienage because Agent Gonalez did not read her *Miranda* warnings beforehand. (Doc. 17 at 20–21.)

Determining whether an immigration officer is required to read *Miranda* warnings

before asking biographical questions is fact-specific. Unwarned statements to civil immigration investigators may be admissible in a criminal prosecution where the investigator "has no reason to suspect that the question asked is likely to elicit an incriminating response[.]" *United States v. Salgado*, 292 F.3d 1169, 1174 (9th Cir. 2002) (quoting *United States v. Mata-Abundiz*, 717 F.2d 1277, 1279 (9th Cir. 1983)). Where the opposite is true, though, a statement may be suppressed. *Mata-Abundiz*, 717 F.2d at 1279-80.

On the facts here, whether Agent Gonzalez was required to read Castillo-Badillo *Miranda* warnings before asking her routine immigration questions presents a close question. On one hand, Agent Gonzalez was a civil investigator who played no role in determining whether to prosecute Castillo-Badillo, and he asked routine biographical questions. *See Salgado*, 292 F.3d at 1174. On the other hand, both Detective Terry and the Border Patrol agents he communicated with had reason to believe Castillo-Badillo was an undocumented alien before Agent Gonzalez arrived. (Doc. 14 at 86; SER-174.) Castillo-Badillo's alienage was the whole reason Border Patrol decided to report to the scene, the decision to prosecute her criminally was made within a few hours after Agent Gonzalez took her to the station, and alienage is an element of the crime with which Castillo-Badillo was charged. (*See* SER-3–4, 75–76.) Based on these facts, Agent Gonzalez had good reason to suspect Castillo-Badillo's answer to his question would be incriminating. *See Mata-Abundiz*, 717 F.2d at 1279-80 (routine biographical questions asked by immigration investigator were "reasonably likely to elicit an incriminating response" where they related "directly to an element of a crime that [the investigator] had reason to suspect" and criminal prosecution followed civil immigration investigation in "close sequence").

But even if Agent Gonzalez was required to give a *Miranda* warning, failing to suppress Castillo-Badillo's unwarned statement was harmless here. *See Salgado*, 292 F.3d 1174-75; *cf. Bradford v. Davis*, 923 F.3d 599, 619 (9th Cir. 2019). First, Agent Gonzalez also ran biometrics during the encounter that identified Castillo-Badillo and linked her to two prior immigration apprehensions. (SER-197–98, 203.) To the extent Castillo-Badillo's

suppression motion was thereby seeking to suppress her identity, it was properly denied. *See United States v. Garcia*, 974 F.3d 1071, 1079 n.4 (9th Cir. 2020) ("the defendant's identity itself cannot be suppressed"); *United States v. Del Toro Gudino*, 376 F.3d 997, 1001 (9th Cir. 2004) (even "egregious" Fourth Amendment violations do not support suppression of identity). Second and independently, the government's trial evidence included both Castillo-Badillo's (unchallenged) post-*Miranda* statement that she did not have a visa and had entered illegally by walking through the desert, and corroborating information from immigration databases. This is not a situation where the unwarned statement was the only proof of alienage at trial. *Compare Salgado*, 292 F.3d at 1174-75 (holding failure to suppress unwarned statements was harmless where government introduced other statements of alienage), *with Mata-Abundiz*, 717 F.2d at 1278, 1280 (reversing conviction where unwarned statement was only evidence of alienage). Because Castillo-Badillo's unwarned statement was entirely cumulative of other evidence presented at trial, its admission was harmless.

### C. Impeachment Information

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (extending *Brady* to impeachment information).[2] A *Brady/Giglio* violation has three elements: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011). There is no *Brady/Giglio* violation when the prosecution discloses impeachment evidence at a time where it still has full value to the defense. *United States v. Houston*, 648 F.3d 806, 813 (9th Cir. 2011).

---

[2] Although the parties analyze this claim under *Brady*, Castillo-Badillo appears to be asserting a *Giglio* violation because she complains the prosecution withheld impeachment information about a government witness.

- 7 -

1    Castillo-Badillo argues the government violated her due process rights when, on the morning of trial and after the suppression hearing, it disclosed that an unsubstantiated claim of racial discrimination was made 21 years prior against Agent Gonzalez. (Doc. 17 at 21-24.) But there was no *Brady/Giglio* violation because the prosecution fully disclosed the impeachment information to the fact-finder—here, the magistrate judge—shortly after receiving it and before trial, and Castillo-Badillo was not prejudiced.

That the magistrate judge was the fact-finder at both the evidentiary hearing and trial, and saw the entirety of the impeachment information before hearing Agent Gonzalez's trial testimony (SER-13–17, 43) seems to foreclose any claim of prejudice. *See United States v. Abonce-Barrera*, 257 F.3d 959, 970 (9th Cir. 2001) ("When a defendant has the opportunity to present impeaching evidence to the jury[,] there is no prejudice in the preparation of his defense.") (simplified). But in addition, the government disclosed the evidence in time for Castillo-Badillo to exploit it fully on cross-examination at trial, and she did. *See Houston*, 648 F.3d at 813 (holding notes turned over during trial while cross-examination was ongoing "still had evidentiary value to the defense"). To the extent Castillo-Badillo challenges the failure to disclose the impeachment information before the evidentiary hearing, there is no "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000). The magistrate judge therefore could not have properly dismissed the indictment on that basis. *See United States v. O'Quinn*, 311 F. App'x 980, 982 (9th Cir. 2009). Because Castillo-Badillo does not show prejudice from the government's late disclosure, her *Brady/Giglio* claim fails.

//

//

//

### III. Conclusion

Having reviewed the evidentiary record against the applicable legal standards, each of the arguments Castillo-Badillo raises in this appeal fails. Her conviction is therefore affirmed.

**IT IS ORDERED** the Magistrate Judge conviction is **AFFIRMED**. The Clerk of Court shall close this case.

Dated this 18th day of February, 2026.

Honorable Krissa M. Lanham
United States District Judge